# Exhibit 13

## STORE LEASE V1

TENANT: Steve Sintetas dba Long Grove Apple Haus

DATE: August 28, 2017



LGI0000548

## TABLE OF CONTENTS

ARTICLE I.       BASIC LEASE PROVISIONS AND DEFINITIONS............................................3

ARTICLE II.      PREMISES AND TERM........................................................................4

ARTICLE III.     INTENIONALLY OMITTED...................................................................5

ARTICLE IV.      RENT   .....................................................................................5

ARTICLE V.       COMMON AREAS AND OPERATING COSTS........................................6

ARTICLE VI.      REAL ESTATE TAXES.......................................................................7

ARTICLE VII.     UTILITY SERVICES..........................................................................8

ARTICLE VIII.    LANDLORD'S OBLIGATIONS.............................................................8

ARTICLE IX.      TENANT'S ADDITIONAL COVENANTS.................................................8

ARTICLE X.       DAMAGE OR TAKING AND RESTORATION........................................ 13

ARTICLE XI.      TENANT'S DEFAULT AND REMEDIES............................................... 13

ARTICLE XII.     MISCELLANEOUS PROVISIONS....................................................... 16

GUARANTY          ...........................................................................................21

LGI0000549

STORE LEASE
## ARTICLE I. BASIC LEASE PROVISIONS AND DEFINITIONS
Section 1.1    Basic Lease Provisions and Definitions.  The following terms whenever used in this Lease shall have the meaning set forth in this Article unless otherwise limited or expanded elsewhere in this Lease.

1.1.1    DATE:    August    , 2017

1.1.2    LANDLORD:    Long Grove Investments, LLC

1.1.3    LANDLORD'S AGENT AND ADDRESS:    Long Grove Investments, LLC
1111 Willis Avenue
Wheeling, Illinois 60090
Attn: Ken Siwieck

1.1.4    TENANT:    Steve Sintetas dba Long Grove Apple Haus

1.1.5    ADDRESS OF TENANT:    2813 Knoll Ct
Long Grove, IL    60047

1.1.6    TENANT'S TRADE NAME:    Long Grove Apple Haus

1.1.7    DEVELOPMENT:    Fountain Square

1.1.8    PREMISES:    Store address: 230 Robert Parker Coffin Road
In Long Grove , IL  60047

1.1.9    FLOOR AREA:    Approximately    4000 SQ FT

1.1.10    ESTIMATED DATE FOR DELIVERY OF THE PREMISES TO TENANT:  ASAP

1.1.11    COMMENCEMENT DATE:  Upon confirmation of the lease document

1.1.12    TERM:  Commencing with the Commencement Date and ending with the Termination Date for a period of
60 MONTHS

1.1.13    OPTION TO EXTEND TERM:
The Tennant MUST notify the Landlord in writing of Tenant's intention to extend not less than 6 months prior to the expiration of the then current Term or extension Term.

1.1.14  Annual Rent

| Year 1 | Base | Area | Monthly Base | Yearly Total | |
|---|---|---|---|---|---|
| | $18.45 | 1500 | $2,306.25 | $27,675.00 | Main level |
| | $10.00 | 2500 | $2,083.33 | $25,000.00 | Lower |
| | | | $4,389.58 | $52,675.00 | Total |

Page 3 of 32

LGI0000550

An annual increase in the base rent apply at each lease anniversary. The increase shall be computed by taking the prior years' base rent and adjusting it in an amount equal to the product of: i. the increase in the Bureau of Labor Statistic's published *Consumer Price Index , US city average, all items,* for the twelve (12) month period ending in the month prior to the rent adjustment month; plus ii. One (1%) percent.

1.1.15   USE: Baking, cooking and production of food and bakery products and the retail sale thereof, plus the sale of novelties and  handmade gifts. In addition to private classes and private instruction related to the baking and production of food and bakery products.

**1.1.16   As an incentive** to this lease, the Tenant will receive three (3) months' abated rent, computed from the Commencement date.

1.1.17   PROHIBITED USES:      Tenant shall operate its business within the Premises in accordance with the Use as stated in Section above and for no other purpose. Tenant shall not violate any Prohibited Uses , which are delineated on Exhibit G, attached hereto, and which may be updated from time-to-time.

1.1.18   GUARANTOR:                     Steve Sintetas


              GUARANTOR'S ADDRESS:     2813 Knoll Ct
                                       Long Grove, IL 60047


 1.1.19   INTENTIONALLY OMITTED


1.1.20   TERMINATION DATE:   The last day of the calendar month immediately preceding the FIFTH anniversary of the commencement date or any anniversary of any renewals.


1.1.21   LEASING BROKER(S): NONE                                                                                        N/A

1.1.22   TENANT'S PRO RATA PERCENTAGE: 9.4% The ratio of (i) the Floor Area of the Premises to (ii) the leasable area of the Building.

1.1.23   ORIGINAL ESTIMATE OF TENANT'S PRO RATA SHARE OF OPERATING  COSTS:
            **DOES NOT APPLY AS THE LEASE IS STATED IN GROSS TERMS**


1.1.24   ORIGINAL ESTIMATE OF TENANT'S PRO RATA SHARE OF REAL ESTATE TAXES AND LONG
            GROVE SPECIAL ASSESSMENT:
            **DOES NOT APPLY AS THE LEASE IS STATED IN GROSS TERMS**

1.1.25   OTHER DEFINITIONS AND REFERENCES

            Section 1.2       Significance of Basic Lease Provisions and Definitions.  Each reference in this Lease to any of the Basic Lease Provisions and Definitions contained in Section 1.1 shall be deemed and construed to incorporate all of the terms provided under each Basic Lease Provision and Definition.

LGI0000551

1.2   Zoning, use and governmental approvals.   From the commencement date and continuing thereafter for a period of thirty (30) days, Tenant shall obtain, or shall satisfy themselves that they may later obtain, all required governmental permits, approvals or authorizations to use the Premises for the Use without alteration beyond normal build out.  If Tenant, in its sole discretion, determines that it cannot obtain such approvals and notifies Landlord prior to the expiration of the contingency period, then and in such event this Lease is terminable by Tenant with no further obligation of either party except Landlord's obligation to refund the Security Deposit.  Nothing in the foregoing precludes Tenant from waiving this contingency prior to the expiration of the contingency period.

Section 1.3      Enumeration of Exhibits.  The exhibits enumerated in this Section and attached to this Lease are incorporated in this Lease by this reference and are to be construed as part of this Lease. (If applicable.)

| | |
|---|---|
| Exhibit A. | Site Plan of the Development. |
| Exhibit B. | Plan of the Premises. |
| Exhibit C. | OMITTED |
| Exhibit D. | OMITTED |
| | |
| Exhibit E. | Sign Criteria. |
| Exhibit F. | Statement as to Commencement Date and Termination Date. |
| Exhibit G. | Prohibited Uses. |

ARTICLE II.  PROPERTY, PREMISES AND TERM

Section 2.1      Property.  Landlord is the owner of the property depicted on Exhibit A and known as the development set forth in Subsection 1.1.7 (the "Property").

Section 2.2      Commercial Parcel.  Landlord intends for the Property to be developed for commercial use (the "Commercial Parcel").

Section 2.3      Building.  Tenant shall be located within the Building located on the Property and containing approximately  4000  square feet of retail space as set forth on Exhibit A hereof (the "Building").

Section 2.4      Premises.  Landlord hereby leases to Tenant, and Tenant hereby accepts from Landlord, subject to and with the benefit of the terms, covenants and conditions of this Lease, the Premises located substantially as set forth on Exhibit A (the "Premises").  The Floor Area is measured to the center line of all interior party, common or partition walls and to the exterior faces of all exterior walls.

Section 2.5      INTENTIONALLY OMITTED

Section 2.6      Shopping Center.  The Commercial Parcel and Access Roads, as set forth on Exhibit A hereof, collectively to be the shopping center (the "Shopping Center").

Section 2.7      Rules. All loading and unloading of goods shall be done only at such times, in the areas and through the entrances designated for such purpose by LANDLORD. No loud speakers, televisions, phonographs, radios, flashing lights, or other devices shall be used in a manner so as to be heard or seen outside of the Leased premises without the prior written consent of LANDLORD. No auction, fire, bankruptcy, or selling-out sales, except those which are lawful and bona fide shall be conducted on or about the Leased premises without the prior written consent of LANDLORD.
TENANT shall maintain standard business hours

Section 2.8      Term.  The term of this Lease shall be for the period commencing on the earlier of (a) the Commencement Date (as set forth in Subsection 1.1.11 or (b) the day Tenant opens for business in the Premises (the

date upon which the Term actually commences is referred to as the "Commencement Date"), and ending on the Termination Date, unless sooner terminated, by lapse of time or otherwise pursuant to the terms of this Lease (the "Term").

                  Section 2.9      <u>Statement as to Commencement Date</u>. When the Commencement Date and Termination Date have been determined as provided in 1.1.11, 1.1.12 and Section 2.8, Landlord and Tenant shall execute and deliver a written statement completed by Landlord or Landlord's Agent in substantially the form attached hereto as Exhibit F, which shall specify the Commencement Date and Termination Date. Tenant shall execute and deliver this statement within ten (10) days after Landlord's written request.

                  Section 2.10      <u>Reservation of Rights by Landlord</u>. Landlord reserves the right to change the name of the Development, the number, configuration, size and location of the units therein, the dimensions of stores and/or offices in such building and the identity and type of other stores and tenancies in the Property. Landlord reserves to itself the exclusive right to use the exterior walls, the roof, the air space above the roof, the space below the floor and the exclusive right to install, maintain, use, repair and replace pipes, ducts, conduits, and wires leading through, to or from the Premises and serving other parts of the Development in locations which will not materially interfere with Tenant's Use. Landlord further reserves the right to make available, alter, add to or delete from common areas in the Development, provided only that the Premises shall be located substantially as depicted on Exhibit A. Notwithstanding anything to the contrary, no representation or warranty, express or implied, is made as to the accuracy of the information, scale, design, configuration or locations on Exhibit A and Exhibit B and the same is subject to error, omissions, changes, alterations, additions and withdrawals without notice.

## ARTICLE III.  INTENTIONALLY OMITTED

## ARTICLE IV.  RENT

                  Section 4.1      <u>Rent</u>. Tenant agrees to pay rent, in lawful money of the United States, in advance and without any demand, deduction or setoff, to Landlord's Agent at Landlord's Agent's Address or to such other person or at such other address as Landlord, or Landlord's Agent, may direct by notice in writing to Tenant from time to time, at the following rates and times:

                  (a)      On the Commencement Date and on the first day of each calendar month thereafter during the Term, an amount equal to 1/12th of the Annual Base Rent for such Operating Year, as hereinafter defined (the "Monthly Base Rent"), except that the first installment of Monthly Base Rent shall be paid concurrently with the execution of this Lease by Tenant. If the Commencement Date is on a day prior to the first day of the first Operating Year, then the Monthly Base Rent for the period prior to the First Operating Year will be at the rate of the Monthly Base Rent due during the First Operating Year and prorated for such period.

Tenant's obligation to pay rent and all other amounts due under this Lease shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

                  Section 4.2      INTENTIONALLY OMITTED

## ARTICLE V.  COMMON AREAS, ACCESS DRIVES AND OPERATING COSTS

LGI0000553

Section 5.1    Common Areas and Facilities. Landlord grants to Tenant, and its agents, employees, licensees and invitees, a non-exclusive right to use the Common Areas in common with others during the Term. The "Common Areas", as herein referred to, will consist of all parking areas, roadways (other than the Access Drives), streets, pedestrian sidewalks (other than the sidewalks located on any building that are immediately adjacent to and surrounding that building (collectively, the "Perimeter Sidewalks")), driveways, delivery areas, landscaped areas, service drives and all other facilities available for common use as generally described in the Site Plan, all as they may from time to time exist and be available to all the tenants in the Building, their employees, agents, customers, licensees and invitees, subject to restrictions as herein provided. Notwithstanding the foregoing, Tenant shall be entitled to utilize exclusively that portion of the common area sidewalk immediately adjacent to the Premises for outdoor seating and sales as depicted on Exhibit B, comprising approximately twenty (20) feet along the side of the Premises. As identified on Exhibit B

Section 5.2    Maintenance and Use of Common Areas. Landlord shall at all times during the Term, maintain, repair, adequately light when necessary during Tenant's customary business hours and for sixty (60) minutes thereafter, clean, promptly remove snow and ice from, pave and repair, seal, stripe, repair pot holes, remove trash and debris, provide adequate drainage, maintain landscaping, supervise and keep available the parking and sidewalk areas of (unless maintenance/repair is required), the Common Areas and the Access Drives in accordance with the standards of a first-class development of the size and location of the Development. The Common Areas shall be maintained for the free and exclusive use of customers, invitees and employees of Tenant and other occupants of the Building. Landlord will have the right, from time to time, to issue rules and regulations with regard to the Development and/or Building as Landlord determines, in its reasonable discretion. The rules and regulations will be customary for developments like the Building located in the suburbs of Chicago, Illinois. The rules and regulations will be uniformly enforced by Landlord against all tenants of the Building. Tenant agrees to abide by all such rules and regulation.

Section 5.3    Access Drives. Landlord grants to Tenant, and its agents, employees, licensees and invitees, for the Term of this Lease, a non-exclusive right and easement to use the Access Drives in common with others during the Term, subject to such reasonable rules and regulations as may from time to time be prescribed by Landlord. Tenant shall pay its pro rata share of Real estate taxes assessed against the Access Drives as well as its pro rata share of the cost of maintenance, repair and replacement of the Access Drives as a Common Area Maintenance Cost.

Section 5.4    Intentionally omitted.

Section 5.5    Intentionally omitted.

Section 5.6    Intentionally omitted.

Section 5.7    Payment of Operating Costs.
**This does not apply as the lease is written in gross terms.**

## ARTICLE VI.  REAL ESTATE TAXES

Section 6.1    Intentionally omitted.

Section 6.2    Intentionally omitted.

Section 6.3    Payment of Real Estate Taxes.
**This does not apply as the lease is written in gross terms.**

Section 6.4    Lease Taxes. If any governmental entity or authority imposes a tax, fee, assessment or other charge upon or measured by reference to any of the rent or other charges payable by Tenant to Landlord under this Lease (whether such tax, fee, assessment or other charge (i) takes the form of a tax on rents, a sales tax or some other form, or (ii) is

Page 7 of 32

LGI0000554

imposed upon Landlord or Tenant), Tenant shall be responsible for and shall pay in a timely manner all such taxes, fees, assessments and other charges (the "Lease Taxes"). Unless Landlord and Tenant otherwise agree in writing with respect to the payment thereof, Tenant shall pay to Landlord the amount of all Lease Taxes attributable to each payment of rent or other charges payable under this Lease together with the payment of such rent or other charges.

## ARTICLE VII. UTILITY SERVICES

Section 7.1     Utilities. Tenant, at Tenant's sole cost and expense, shall be solely responsible for and shall promptly pay all charges for use or consumption of heat, air conditioning, sewer, water, gas, electricity or any other utility services to the Premises. Interruption or impairment of any such utility or related service, caused or necessitated by repairs, improvements, or other causes beyond Landlord's direct control, shall not give rise to any right or cause of action by Tenant against Landlord in damages or otherwise. Landlord shall not be liable for, and Tenant shall not be entitled to, an abatement of rent in the event of any interruption in the supply of any utility or related service, and the same shall not be construed as an actual or constructive eviction of Tenant. Tenant agrees that it will not install any equipment which will exceed or overload the capacity of any utility facilities and that if any equipment installed by Tenant shall require additional utility facilities, the same shall be installed at Tenant's sole cost and expense in accordance with all laws, regulations and ordinances and in accordance with plans and specifications to be approved in writing in advance by Landlord.

Section 7.2     Heating and Air Conditioning. Heating and air conditioning shall be thermostatically controlled in the Premises, and Tenant agrees to maintain, keep in good repair and replace when necessary during the Term at Tenant's sole cost and expense all heating, ventilating and air conditioning equipment and systems located in or serving the Premises. Landlord hereby assigns to Tenant its rights under any warranties Landlord has received, if any, with respect to such equipment and systems. At all times during the Term, Tenant shall, at Tenant's sole cost and expense, have and keep in force a maintenance contract (in a form and with a contractor satisfactory to Landlord) providing for inspection, maintenance and necessary repairs (including replacement) of the heating, ventilating and air conditioning equipment in or serving the Premises at least once each calendar quarter unless Landlord, at Landlord's option and Tenant's expense otherwise provides such maintenance service. The maintenance contract shall provide that it will not be cancelable by either party thereto except after thirty (30) days' prior written notice to Landlord. Tenant shall provide Landlord with a copy of such maintenance contract.

## ARTICLE VIII. LANDLORD'S OBLIGATIONS

Section 8.1     Repairs by Landlord. Landlord shall, at its expense, keep the foundations, floor, roof and exterior walls of the Premises (excluding glass, plate glass, store fronts and doors, door closures, door locks) , in good order, repair and condition, unless any such work is required because of damage caused by any act, omission or negligence of Tenant, any employees, agents, invitees, guests, concessionaires, licensees, sublessees or contractors of Tenant or any of their respective employees, agents, invitees, guests, concessionaires, licensees, sublessees or contractors, or any person or entity claiming by, through or under Tenant in which event Tenant shall be responsible, at Tenant's sole cost and expense (or, at Landlord's option, Landlord shall make such repair and be reimbursed by Tenant), for such repair. Except as otherwise provided in this Section, Landlord shall not be obligated to make repairs, replacements or improvements of any kind upon the Premises, or any equipment, facilities or fixtures contained therein or serving the Premises, which shall be the sole responsibility of Tenant as provided in this Lease.

Section 8.2     Quiet Enjoyment. Landlord covenants and agrees that so long as Tenant has committed no default under this Lease, Tenant's peaceful and quiet possession of the Premises during the Term shall not be disturbed by Landlord or by anyone claiming by, through or under Landlord, subject to the terms and conditions of this Lease.

## ARTICLE IX. TENANT'S ADDITIONAL COVENANTS

LGI0000555

Section 9.1     <u>Affirmative Covenants</u>. Tenant covenants and agrees at its sole cost and expense at all times during the Term, such further time as Tenant occupies the Premises or any part thereof and such further time as indicated below:

9.1.1     To promptly perform all of the obligations of Tenant set forth in this Lease including, but not limited to, paying when due all Monthly Base Rent and any and all other charges, rates and other sums which, by the terms of this Lease, are to be paid by without any setoffs or counterclaims whatsoever. The foregoing covenant shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

9.1.2     To open, occupy and continuously use the Premises only for Tenant's Use and for no other purpose; to operate its business in the Premises under Tenant's Trade Name only; and to conduct its business at all times in a first class and reputable manner.

9.1.3     Except when and to the extent that the Premises are untenantable by reason of damage by fire or other casualty, to use and continuously operate only for Tenant's Use, all of the Premises other than such minor portions thereof as are reasonably required for storage and office purposes; to use such storage and office space only in connection with the business conducted by Tenant in the Premises; to furnish and install all trade fixtures which shall, at all times, be suitable and proper for carrying on Tenant's business.

9.1.4     To conform to all rules and regulations which Landlord may make in the management and operation of the Development and require such conformance by Tenant's employees, agents, contractors, guests, invitees, permitted sublessees, concessionaires and licensees or any person or entity claiming by, through or under Tenant; to receive and deliver goods and merchandise only in the manner and at such times and in such areas as may be designated by Landlord; to keep all drains inside the Premises clean; and to store all trash and garbage in adequate containers, which Tenant shall maintain in a neat and clean condition so as not to be visible to members of the public shopping in the Development, and so as not to create any health or fire hazard, and to maintain a refrigerated area within the Premises for storage of wet garbage prior to pickup. Tenant shall not burn any trash or garbage at any time in or about the Development and Tenant shall, at Tenant's expense, attend to the daily disposal thereof in the manner designated by Landlord.

9.1.5     Except for repairs required in Section 8.1 to be performed by Landlord, to keep the Premises including, but not limited to, all entrances, vestibules, partitions, windows and window frames, moldings, doors, plumbing, electrical and lighting equipment and wiring, HVAC equipment, fixtures and equipment, the fire protection system, any security screen, wall and/or store front (the installation of which shall be subject to Landlord's approval) and fixtures and displays (including show windows and signs) clean, neat and safe and in good order, repair and condition (including all necessary replacement, painting and decorating), and to keep all glass, including that in windows, doors, store fronts, fixtures and skylights, clean, neat and safe and in good order, repair and condition, and to replace promptly glass which may be damaged or broken with glass of the same quality, damage by fire or other casualty covered by Landlord's insurance excepted. The Tenant acknowledges and agrees that the kitchen equipment within the premises that is listed on the attached Exhibit C, "Kitchen Equipment", shall remain within the premises during the term of the lease and the Tenant shall not remove any such kitchen equipment from the premises during the Lease. Furthermore, the Tenant acknowledges and agrees that all the kitchen equipment is the property of the Landlord and shall remain the property of the Landlord during the term of the lease and upon expiration of the term and termination of the Tenants right to possession. The Tenant acknowledges that he has received said equipment in good working condition which is verified by the signatures on Exhibit C It is also agreed that it is the Tenant's responsibility to maintain all kitchen equipment on the premises in good working order. If, in an emergency, it shall become necessary to promptly make any repairs or replacements required to be made by Tenant, Landlord may enter the Premises and proceed to make such repairs or replacements and pay the cost thereof. Tenant shall reimburse Landlord for the cost thereof within thirty (30) days after Landlord renders a bill to Tenant.

9.1.6     Except for repairs required in Section 8.1 to be performed by Landlord, to make all repairs, alterations, additions or replacements to the Premises and all mechanical, electrical and plumbing systems located within the Premises, whether interior or exterior, structural or nonstructural, required by any law or ordinance or any order or regulation of any public authority, or fire underwriters or underwriters' fire prevention engineers and to keep the Premises equipped with all safety appliances required because of Tenant's Use; to procure any licenses and permits required for Tenant's Use; and to comply with the laws, orders and regulations of all governmental authorities and the reasonable recommendations and requirements of Landlord's insurance carriers and their underwriters.

LGI0000556

9.1.7    To promptly pay when due the entire cost of any work in the Premises undertaken by Tenant including, without limitation, Tenant's Work, so that the Premises shall at all times be free of liens for labor and materials; to procure all necessary permits before undertaking such work; to do all work in a first class, good and workmanlike manner employing new materials of good quality; to comply with all governmental requirements; and to defend, indemnify and hold Landlord, Landlord's beneficiaries and their respective partners, officers, directors, shareholders, employees and agents harmless from all claims, liability, injury, loss, cost, damage and expense (including, but not limited to, reasonable attorneys' fees and expenses) in respect to injury to, or death of, any person, or damage to, or loss or destruction of, any property occasioned by or growing out of such work.

9.1.8    To defend, indemnify and hold Landlord, Landlord's partners, beneficiaries and their respective agents, harmless from all claims, liability, injury, loss, cost, damage and expense (including, but not limited to, reasonable attorneys' fees and expenses) with respect to any injury to, or death of, any person, or damage, theft or destruction of any property, whether or not occurring on the Premises or any other part of the Development, occasioned by any act or omission of Tenant, Tenant's agents, employees, contractors, sublessees, concessionaires, licensees, invitees or guests or any other person or entity claiming by, through or under Tenant. The foregoing covenants shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

9.1.9    To maintain in responsible companies, approved by Landlord, public liability insurance on the Premises during the Term of this Lease, insuring Tenant, as well as Landlord and Landlord's Mortgagees (as defined in Section 12.5) as additional insured thereunder, Landlord's beneficiaries and all of their respective agents, beneficiaries, partners, officers, servants and employees, from and against any and all claims, demands or actions for injury to or death of any one person in an amount of not less than $1,000,000, for injury or death of more than one person in any one occurrence in an amount of not less than $1,000,000 and for damage to property with a deductible of no more than $1,000 and in an amount not less than $500,000 made by or on behalf of any persons, firm or corporation, arising from, related to, or connected with the conduct and operation of Tenant's business in the Premises and the businesses of all of Tenant's sublessees, concessionaires and licensees and, in addition, and in like amounts, covering Tenant's contractual liability under the hold harmless provisions contained in this Lease; to carry like coverage against loss or damage by boiler or compressor or internal explosion of boilers or compressors, if there is a boiler or compressor in or serving the Premises; to maintain plate glass insurance covering all plate glass in the Premises; to maintain all-risk insurance including, but not limited to, fire, vandalism and malicious mischief and sprinkler leakage, extended coverage, covering all of Tenant's equipment stock-in-trade, trade and other fixtures, furniture, furnishings, floor coverings and all items of personal property of Tenant located on or within the Premises to the extent of 100% of their replacement cost naming Landlord as an additional named insured; and in the event liquor is sold from the Premises, to maintain liquor legal liability insurance. Tenant shall procure and maintain, at its expense, business interruption or extra expense insurance with coverage limits not less than those carried by a reasonably prudent tenant subject to Landlord's approval, but in no event less than the applicable annual Base Rent. All insurance shall be in a form, and carried with responsible companies of recognized standing authorized to do business in the state in which the Premises are located, each satisfactory to Landlord and Landlord's Mortgagees and shall (a) provide that any release from liability or waiver of claim for recovery entered into in writing by the insured or any additional insured prior to any loss or damage shall not affect the validity of such policy or the right of any insured or additional insured to recover thereunder, (b) contain a waiver of subrogation clause in a form and content satisfactory to Landlord, and (c) provide that it will not be subject to cancellation, non-renewal, reduction or other change, except after at least thirty (30) days' prior written notice to Landlord. The policies or duly executed certificates for the same (which shall evidence the insurer's waiver of subrogation) together with satisfactory evidence of the payment of the premium thereon, shall be deposited with Landlord on or before the Date for Delivery of the Premises to Tenant and, upon renewals or replacements of such policies, not less than thirty (30) days prior to expiration of the term of such coverage. If Tenant fails to comply with such requirements, Landlord may obtain such insurance and keep the same in effect, and Tenant shall pay Landlord, as additional rent due hereunder, the premium cost thereof upon demand.

9.1.10    That Landlord and Landlord's beneficiaries and their respective partners, officers, directors, shareholders, agents and employees shall not be liable for, and Tenant shall not be entitled to, an abatement in rent in respect of, and, to the extent permissible by state law, Tenant waives all claims for, damage to person or property sustained by Tenant or any person or entity claiming by, through or under Tenant resulting from, any accident or occurrence in or upon the Premises or the building of which they shall be a part, or any other part of the Development including, but not limited to: (a) any equipment

LGI0000557

or appurtenances becoming out of repair; (b) Landlord's failure to keep such building or the Premises in repair; (c) injury done or occasioned by wind, water or other natural element; (d) any defect in or failure of plumbing, heating, ventilating or air conditioning equipment, electric wiring or installation thereof, gas, water and steam pipes, stairs, railings, elevators, escalators or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the discharge from any automatic sprinkler system; (h) the bursting, leaking or running of any tank, tub, washstand, sprinkler system, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises or the building of which the Premises are a part; (i) the escape of steam or hot water; (j) water, snow or ice being upon or coming through the roof, skylight, trapdoor, stairs, walks or any other place upon or near such building or the Premises or otherwise; (k) the falling of any fixture, plaster or stucco; and (l) any act, omission or negligence of Landlord, its beneficiaries or any of their authorized agents or employees, other tenants in the Development or of other persons or occupants of such buildings or of adjoining or contiguous buildings or of owners of adjacent or contiguous property.

9.1.11    To permit Landlord, its beneficiaries, mortgagees or their respective employees, agents and contractors, to enter the Premises at reasonable times (except, in case of an emergency, at any time) for the purpose of inspecting the Premises, or making repairs, additions or alterations thereto or to the building in which the Premises is located, and of showing the Premises to prospective purchasers, lenders and tenants, and other persons having a legitimate interest in inspecting the Premises.

9.1.12    To remove, at Tenant's sole cost and expense, at the expiration or termination of this Lease, due to the lapse of time or otherwise, all of Tenant's trade fixtures and any goods and effects which are not permanently affixed to the Premises or the property of the Landlord, Tenant's store sign, all carpet, and all of the alterations and additions made by Tenant, as Landlord may request reasonably in advance; to repair any damage caused by such removals; to deliver all keys for and all combinations on all locks, safes and vaults in the Premises to Landlord; and to peaceably yield up the Premises and all alterations, additions, floor covering and carpeting thereto (except such as Landlord has requested Tenant to remove) and all decorations, fixtures, furnishings, partitions, heating, ventilating and cooling equipment and other equipment, which are permanently affixed to the Premises, which (if not then the property of Landlord) shall thereupon become the property of Landlord without any payment to Tenant, in clean and good order, repair and condition, damage by fire or other casualty and reasonable wear and tear excepted.  Any personal property of Tenant not removed within five (5) days following such expiration or termination shall, at Landlord's option, become the property of Landlord without payment to Tenant.  Tenant waives all rights to notice and all common law and statutory claims and causes of action against Landlord subsequent to such five (5) day period.  The foregoing covenants shall survive the expiration or termination of this Lease due to the lapse of time or otherwise.

9.1.13    To remain fully obligated under this Lease notwithstanding any assignment or sublease or any indulgence granted by Landlord to Tenant, Tenant's assignee, sublessee or guarantor of Tenant's obligations hereunder.

9.1.14    To give Landlord prompt written notice of any accident, casualty, damage or other similar occurrence in or to the Premises or the Common Areas of which Tenant has knowledge.

9.1.15    To keep the Premises sufficiently heated at all times to prevent water pipes from freezing and any other damage occurring due to low temperatures in the Premises.

9.1.16    To install, maintain and keep in good repair, at Tenant's sole cost and expense, signs bearing Tenant's Trade Name on the Premises, visible from outside of the Premises, in accordance with the Sign Criteria (a copy of which is attached as Exhibit E) as amended by Landlord from time to time.

9.1.17    If required of Landlord by local governing agencies, Tenant shall provide the Landlord with the ST-1 sales tax form within 15 days after the end of each calendar quarter, or any appropriate successor forms, that are filed by retailers with the State of Illinois.  Landlord shall keep such information confidential, except that Landlord shall be authorized to provide a copy of the ST-1 form to the local governing agency.

9.1.18    Tenant's Exclusive Use.  Landlord and Tenant agree that Tenant's business would be irrevocably harmed and the value of the leasehold estate would be reduced in there existed within the Development another tenant or tenants engaged in uses similar to Tenant's Use as described herein.  Landlord agrees that, during the term of this Lease or any extension term, that Landlord shall not enter into any new leases with tenants engaged in uses substantially similar to Tenant's Use,



LGI0000558

excepting therefrom similar uses which are incidental and *de minimus.*

       Section 9.2      Negative Covenants.  Tenant covenants and agrees at all times during the Term and such further time as Tenant occupies the Premises or any part thereof:

       9.2.1     Not to injure, overload, deface or otherwise harm the Premises or the Development; nor commit any nuisance; or unreasonably annoy owners or occupants of neighboring property; nor use the Premises for any hazardous purpose or in any manner that will suspend, void, make inoperative or increase the cost of any policy of Development Insurance; nor burn any trash or refuse within the Development; nor sell, display, distribute or give away any alcoholic liquor or beverages; nor permit or cause odors to emanate or be dispelled from the Premises; nor solicit business in the Common Areas nor distribute advertising material to, in or upon any Common Areas; nor sell, distribute or give any product or service which tends to create a nuisance in the Common Areas; nor make any use of the Premises which is improper, offensive or contrary to any law or ordinance or any regulation of any applicable governmental authority.

       9.2.2     Not to make any alterations or additions to the Premises, nor permit the making of any holes in the walls, partitions, ceilings or floors; nor place a load on any floor in the Development or Premises which exceeds the floor load per square foot which such floor was designed to carry; nor permit any roof penetrations; nor install any electrical equipment which overloads the electrical panel to the Premises; nor permit the painting or placing of any exterior signs, placards or other advertising media, awnings, aerials, antennas, or the like, without on each occasion obtaining the prior written consent of Landlord, which consent shall depend in part upon Landlord's review and approval by Landlord of plans and specifications which are deemed necessary or appropriate by Landlord, and on each occasion complying with all applicable statutes, ordinances, regulations, codes and Landlord's sign and design criteria. If Landlord consents to any roof penetration, Tenant shall cause such penetration to be made under and pursuant to the supervision of Landlord's roofing contractor, at Tenant's sole cost and expense.

       9.2.3     Not to assign, sell, mortgage, pledge, hypothecate or in any manner transfer or encumber this Lease or any interest therein, whether by operation of law or otherwise, and not to assign this Lease or sublease the Premises or any part thereof, or permit occupancy by anyone with, through or under it without the prior written consent of Landlord, in Landlord's sole discretion. Consent by Landlord to any assignment or subletting shall not waive the necessity for consent to any subsequent assignment or subletting. Tenant shall pay to Landlord all of Landlord's costs which are incurred in reviewing Tenant's request for such consent including, but not limited to, Landlord's attorneys' fees and expenses.

       9.2.4     Not to operate or use, or permit or suffer to be operated or used, all or any part of the Premises for any use or purpose other than Tenant's Use, nor any other use or purpose which is inconsistent with the image and standard of quality of the Development, it being mutually acknowledged that the Development is to be operated as a first class Development; and not to violate any exclusive rights granted to other tenants of the Development of which Tenant has been given, or in the future is given, written notice by Landlord, provided Tenant may continue to use the Premises in accordance with the terms of this Lease.

       9.2.5     Not to suffer any mechanics', laborers' or materialmen's liens to be filed against the Premises or the Development or any interest therein by reason of any work, labor, services performed at, or materials furnished to, or claimed to have been performed at, or furnished to, the Premises, by, or at the direction or sufferance of, Tenant, or anyone holding the Premises or any portion thereof, through or under the Tenant; provided, however, that if any such liens shall, at any time, be filed or claimed, Tenant shall have the right to contest, in good faith and with reasonable diligence, any and all such liens, provided security reasonably satisfactory to Landlord is deposited with Landlord to insure payment thereof, together with all interest and other costs associated therewith and to prevent any sale, foreclosure or forfeiture of the Premises or the Development by reason of nonpayment thereof. On final determination of the lien or claim for lien, Tenant shall immediately pay any judgment rendered, with all proper costs and charges, and shall have the lien released of record and any judgment satisfied.

       9.2.6     Not to locate any fixtures, equipment, inventory, signs, placards or any other kind of advertising material in the Common Areas nor outside of the store front or store windows in the areas, if any, of the Premises between such front or windows and the border line between the Premises and the Common Areas, except as may be allowed in the outdoor seating and sales area depicted on Exhibit B, which Landlord has specifically granted exclusive use to Tenant over.



LGI0000559

9.2.7    Other than customary window displays installed in compliance with Landlord's sign criteria and consistent with the character and standards of the Development, not to affix, maintain or locate (1) upon the glass panes or supports of any window (or within less than twenty-four (24) inches of any window or glass door), (2) upon doors or any exterior walls, including the rear of the Premises, or (3) within twenty-four (24) inches of the lease line where the Premises shall have an open or glass front, any merchandise, inventory, fixtures, equipment, signs, advertising placards, names, insignias, trademarks, descriptive material or any other such like item or items, except all such items as shall have first been approved in writing by Landlord as to size, type, color, location, copy, nature and display qualities.

9.2.8    Not to bring, place, hold, dispose of or permit to remain in, on, under, about or into the atmosphere of the Premises or the Development, any asbestos, in any form or condition, petroleum or petroleum products, including, but not limited to, crude oil or any fraction thereof, explosives, toxic materials, or substances defined as hazardous wastes, hazardous materials, or hazardous substances under any federal, state, or local law or regulation (the "Hazardous Materials"), except ordinary office products used on the Premises or the Development and stored in the usual manner and quantities. Tenant's violation of the foregoing prohibition shall constitute a material breach and default hereunder and Tenant shall indemnify, hold harmless and defend Landlord from and against any claims, damages, penalties, liabilities and costs (including reasonable attorneys' fees and court costs) caused by or arising out of (i) a violation of the foregoing prohibition, or (ii) the presence or any release of any Hazardous Materials in, on, under, about or into the atmosphere of the Premises or the Development during the term of this Lease. Tenant shall clean up, remove, and repair any soil or ground waste contamination and damage caused by the presence and any release of any Hazardous Materials in, on, under, about or into the atmosphere of the Premises or the Development prior to, during, or after the term of this Lease in conformance with the requirements of applicable law or any existing or future lender. Tenant shall immediately give Landlord written notice of any suspected breach of this paragraph upon learning of the presence or any release of any Hazardous Materials, and upon receiving any notices from governmental agencies pertaining to Hazardous Materials which may affect the Premises or the Development. The obligations of Tenant hereunder shall survive the expiration or earlier termination, for any reason, of this Lease.

To the best of Landlord's actual knowledge, Landlord hereby warrants and represents that: (a) the Premises has never been used by the current owners or occupants to generate, transport, treat, store, manufacture, emit, dispose of, refine or handle any dangerous toxic or hazardous pollutants, chemicals, wastes or substances, (b) the Premises does not contain any underground storage tanks or any asbestos, polychlorinated biphenyls (PCBs) or other toxic materials, pollutants, hazardous substances or hazardous wastes, or (c) Landlord has not received a summons, citation, directive, letter or other communication, written or oral, from any state agency or the U. S. Government concerning the Premises of any intentional or unintentional action or omission on Landlord's part as a result of the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of toxic or hazardous pollutants, chemicals, wastes or substances into waters or onto land of the state in which the Premises is located, or into water outside the jurisdiction of the state in which the Premises is located, and the Premises is not subject to any "superfund" type liens or claims by governmental regulatory agencies or other third parties arising from the release or threatened release of toxic or hazardous pollutants, chemicals, wastes or substances in, on or about the Premises.

Landlord shall indemnify, defend and hold Tenant harmless from and against any and all loss, cost, liability, damage or expense (including without limitation attorneys' fees, investigation and court costs) which Tenant may incur, sustain or suffer or which may be asserted against Tenant by reason of any violation of any representation or warranty made by Landlord herein; and liability Tenant may incur for cleanup or response costs, fines or penalties resulting from a release or a threatened release of any materials defined above.

## ARTICLE X.  DAMAGE OR TAKING AND RESTORATION

Section 10.1    Fire, Explosion or Other Casualty.

10.1.1    If a fire, explosion or other casualty damages either the Premises by fifty percent (50%) or less of its replacement cost, or the Development by twenty-five percent (25%) or less of its replacement cost, then Landlord shall repair the damage to the Premises, if any, caused by such casualty within ninety (90) days after insurance proceeds are available therefor; provided, said ninety (90) day period shall be extended so long as Landlord is diligently prosecuting such repair work.

Page 13 of 32

If a fire, explosion or other casualty damages either the Premises by more than fifty percent (50%) of its replacement cost, or the Development by more than twenty-five percent (25%) of its replacement cost, then Landlord may elect to terminate this Lease by giving Tenant notice thereof within ninety (90) days after the casualty, in which case this Lease shall terminate as of the thirtieth (30th) day after the date such notice is sent by Landlord.

10.1.2    If a casualty renders the Premises untenantable, in whole or in part, and the damages shall not have been due, in whole or in part, to the default or neglect of Tenant, a proportionate abatement of Monthly Base Rent and shall be allowed from the date when the damage occurred until the date Landlord completes its work in the Premises pursuant to this Section, such proportion to be computed on the basis of the relation which the gross square foot area of the space rendered untenantable bears to the Floor Area of the Premises.  If a casualty occurs damaging the Premises and this Lease is not terminated, Tenant shall repair or replace Tenant's Work and Tenant's stock-in-trade, fixtures, furniture, furnishings, floor coverings and equipment and, if Tenant has closed, Tenant shall reopen for business as soon after Landlord's completion of its repair of the Premises as reasonably possible.

10.1.3    If the Premises are damaged by a casualty, such casualty was not due, in whole or in part, to the default or neglect of Tenant, and Landlord fails to substantially complete its repairs of the Premises (punch list items excepted) within the period provided for such repairs in Subsection 10.1.1, then Tenant may elect to terminate this Lease by giving Landlord written notice thereof after such period, but prior to Landlord's substantial completion of its repairs of the Premises, in which case this Lease shall terminate as of the date Landlord receives such notice.  Upon any such termination by Tenant following Landlord's failure to repair, Landlord shall concurrently with the termination forgive any outstanding principal of the Promissory Note between Landlord and Tenant of an even date with this Lease.  Except as provided in this Subsection, Tenant waives any right to cancel this Lease as a result of damage to the Premises because of any casualty pursuant to any presently existing statute, any statute that may be enacted in the future, or any other law.

Section 10.2    Eminent Domain.

10.2.1    If all or any portion of the Premises is taken by any public authority by the exercise, or under the threat of the exercise, of the power of eminent domain (collectively, a "Condemnation"), this Lease shall terminate as of the day the right to possession is taken.  Landlord shall concurrently with the termination forgive any outstanding principal of the Promissory Note between Landlord and Tenant of an even date with this Lease

10.2.2    If more than twenty-five percent (25%) of the total area of the Development is taken by Condemnation, Landlord may elect to terminate this Lease by giving Tenant notice thereof, said termination to be effective on the day the right to possession of such portion of the Development is taken.

10.2.3    All compensation awarded for any taking under the power of eminent domain, whether for the whole or a part of the Premises, shall be the property of Landlord, whether such damages shall be awarded as compensation for diminution in the value of the leasehold or to the fee of the Premises or otherwise and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such compensation; provided, Tenant may seek a separate award in a separate action for Tenant's personal property, moving expenses and lost business, and Landlord will cooperate with Tenant with regard thereto, so long as no such award is based upon a diminution of Tenant's leasehold interest hereunder and no such award will reduce the amount of any award which would otherwise be receivable by Landlord.  Tenant agrees to execute such instruments of assignment as may be required by Landlord, to join with Landlord in any petition for the recovery of damages, if requested by Landlord, and to turn over to Landlord any such damages that may be recovered in any such proceeding.

## ARTICLE XI.  TENANT'S DEFAULT AND REMEDIES

LGI0000561

Section 11.1    Defaults by Tenant.  Without further notice, Landlord may, at its option, exercise any of the remedies for breach of this Lease provided herein or provided at law, in equity or by statute, if any of the following events ("Event of Default") occurs and such event continues beyond any applicable cure period as set forth in this lease:

(a)    Tenant fails to pay any and all Monthly Base Rent or other charges or payments provided to be made under this Lease within five (5) days after the same shall be due;

(b)    Tenant fails to open for business as provided in Subsection 9.1.2 or ceases operation in all or a material portion of the Premises prior to the Termination Date or abandons or vacates the Premises;

(c)    Tenant fails to immediately cure any hazardous or environmental condition which Tenant has created after Tenant receives notice thereof or, if earlier, after Tenant has actual knowledge thereof;

(d)    Tenant does not pay within ten (10) days after written demand any other liability to Landlord arising out of, or in connection with, any obligation of Tenant to Landlord relating to the Development;

(e)    Tenant fails to perform in a complete manner any other term, covenant or condition of Tenant in this Lease and, unless it is expressly provided in this Lease that a specified act or omission by Tenant constitutes a default hereunder without notice from Landlord, such failure continues for thirty (30) days after notice thereof;

(f)    A receiver or similar officer becomes entitled to this leasehold;

(g)    Tenant's interest in this Lease is taken by execution or other process of law in any action against Tenant;

(h)    The Premises are levied upon by any revenue officer or similar officer;

(i)    Tenant does, or permits to be done, any act which creates a mechanic's lien or claim against the Premises or the land or building of which the Premises are a part and Tenant does not promptly comply with the provisions hereunder with respect thereto;

(j)    Tenant shall repeatedly be late in the payment of any rent or other charges to be paid hereunder or shall repeatedly default in the keeping, observing or performing of any other term, covenant or condition to be kept, observed or performed by Tenant (provided notice of such late payment or other defaults shall have been given to Tenant, but whether or not Tenant shall have timely cured any such late payment or other defaults of which notice was given).  For purposes of this Section only, the term "repeatedly" shall mean three or more occurrences within any period of twelve consecutive calendar months; or

(k)    Tenant has submitted any fraudulent report required to be furnished hereunder or breaches any representation or warranty made hereunder.

Section 11.2    Termination Upon Default.  Upon the occurrence of any Event of Default, Landlord may, in addition to all other rights and remedies it may have, terminate this Lease by giving written notice to Tenant.  Either before or after such termination of this Lease, Landlord may re-enter the Premises, with process of law, to remove all persons, fixtures and chattels therefrom and, at Landlord's option, to store the same at Tenant's expense.  Tenant shall pay to Landlord on demand, as damages and not as a penalty, the sum of (1) any and all rents and other charges due and payable by Tenant as of the date of termination, plus (2) the unamortized cost to Landlord, computed in accordance with generally accepted accounting principles, of improvements to the Premises, if any, provided by Landlord at its expense or otherwise paid for by Tenant, plus (3) a sum of money equal to the then present value using an annual discount rate equal to the current market rate (as hereinafter defined) as of the date the Lease is terminated less 2% of (i) the Annual Base Rent for the remainder of the Term, and all other charges provided herein to be paid by Tenant to Landlord for the remainder of the Term, less (ii) the fair rental value of the Premises for said period (not of the cost of reletting the Premises), plus (4) the cost of performing any other covenants to be performed by Tenant for the remainder of the Term, plus (5) any other damages sustained by Landlord due to any Event of Default including, but not limited to, reasonable attorneys' fees and court costs.  Nothing contained herein shall limit or prejudice the right of Landlord to prove for and obtain as damages, by reason of such Event of Default, an amount equal to the maximum allowed by

Page 15 of 32

any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount referred to above.

Section 11.3     <u>Repossession Upon Default</u>. Upon the occurrence of any Event of Default, Landlord may repossess the Premises by forcible entry detainer suit or otherwise, without demand or notice of any kind to Tenant (except as otherwise expressly provided for) and without terminating this Lease, in which event Landlord shall use commercially reasonable efforts to relet all or any part of the Premises for such rent and upon such terms as shall be satisfactory to Landlord (which may include reletting the Premises for a term greater or lesser than that remaining under the Term, reletting the Premises as a part of a larger area, and changing the character or use made of the Premises); provided, if other space in the Development is then available or is expected to become available, Landlord may endeavor to lease such other space to prospective tenants rather than the Premises. For the purpose of such reletting, Landlord may decorate and make any repairs, changes, alterations or additions in or to the Premises that may be necessary or convenient. Whether or not the Premises or any part are relet, Tenant shall pay to Landlord on demand any and all rents and other charges payable by Tenant as of the date Landlord repossesses the Premises. Tenant shall be liable for and shall pay from time to time upon demand from Landlord the difference between (1) the Annual Base Rent or any portion thereof, and all other charges provided herein to be paid by Tenant for the remainder of the Term, and (2) the net avails of any reletting, if any, during the Term and Tenant agrees that Landlord need not wait until the termination of this Lease to recover any sums falling due under the terms of this Section Upon default, the Tenant will surrender the premises with all equipment contained on the premises that is necessary to regular operations of the business. If the Premises are relet, Tenant shall pay to Landlord, upon demand, any cost or expense incurred by Landlord in such reletting including, but not limited to, any and all expenses for decorations, repairs, changes, alterations, additions, brokers' commissions and reasonable attorneys' fees. In no event, however, shall Landlord be under any obligation to relet the Premises for any purpose, nor shall Landlord be liable for any failure to relet, failure to collect rent or giving rental or other concessions to any new tenant. No such re-entry or reletting by Landlord shall constitute an election to terminate this Lease unless and until Landlord gives Tenant written notice of Landlord's election to terminate, nor shall it relieve Tenant of its obligations under this Lease, all of which shall survive such repossession, reletting or both.

Section 11.4     <u>Bankruptcy Default</u>. If Tenant or any Guarantor of this Lease shall become bankrupt or insolvent or unable to pay its debts as such become due, or shall file any debtor proceedings, or if Tenant or any Guarantor shall take or shall have taken against either party, in any court, pursuant to any statute either of the United States or of any state, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or any such Guarantor's property, which petition is not dismissed within thirty (30) days, or if Tenant or any such Guarantor makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement, then the occurrence of any one of such events shall constitute an Event of Default and Landlord may exercise any of the remedies for an Event of Default provided herein or provided at law, in equity or by statute.

Section 11.5     <u>Additional Remedies</u>. In the event of any breach or threatened breach by Tenant of any of the terms, covenants or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any right and remedy allowed at law or in equity or by statute or otherwise as through re-entry, summary proceedings, and other remedies not provided for in this Lease.

Section 11.6     <u>Interest and Late Charge on Late Payment</u>. Any rent or other charges to be paid hereunder by Tenant which shall not be paid when due shall bear interest at the rate of ten percent (10%) per annum, from the date when the same is due and payable under the terms of this Lease until the same shall be paid (the "Default Rate"). In addition, if Tenant fails to pay rent or any other charge when due, then Tenant shall pay Landlord a late payment service charge covering administrative and overhead expenses equal to Fifty Dollars ($50.00). Tenant shall pay a Twenty-Five Dollar ($25.00) charge for any checks written to Landlord and returned for insufficient funds.

Section 11.7     <u>Holdover by Tenant</u>. Any holding over by Tenant of the Premises after the expiration of the Term of termination of this Lease shall operate and be construed to be a tenancy from month-to-month only, at a rental rate equal to twice the latest applicable Monthly Base Rent. Nothing in this Section shall be construed to give Tenant the right to hold over after the expiration or termination of this Lease, and Landlord may exercise any and all remedies at law or in equity to recover possession of the Premises.

LGI0000563

Section 11.8 <u>Landlord's Right to Cure Defaults.</u> Landlord may, but shall not be obligated to, at any time, without notice, cure any default by Tenant under this Lease, and whenever Landlord so elects, all costs and expenses paid by Landlord in curing such default including, without limitation, reasonable attorneys' fees and expenses, shall be deemed additional rent immediately due and payable upon demand together with interest (except in the case of attorneys' fees) at the Default Rate.

Section 11.9 <u>Effect of Waivers of Default.</u> No consent or waiver, expressed or implied, by Landlord to or of any breach of any term, covenant or condition of this Lease shall be construed as a consent or waiver to or of any other breach of the same or any other term, covenant or condition. No payment by Tenant nor receipt from Landlord of a lesser amount than the rent or other charges due hereunder shall be deemed to be other than on account of the earliest unpaid rent or other charges due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord shall accept such check for payment without prejudice to Landlord's right to recover the balance of such rent or other charge or pursue any other remedy available to Landlord.

Section 11.10 <u>Remedies Cumulative.</u> No remedy herein or otherwise conferred upon or reserved to Landlord shall be considered to exclude or suspend any other remedy, but the same shall be cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute, and every power and remedy given by this Lease to Landlord may be exercised from time to time and so often as occasion may arise or as may be deemed expedient by Landlord.

Section 11.11 <u>Costs of Collection.</u> Tenant or Landlord, as the case may be (the "Indemnitor"), shall on demand pay or reimburse the other party (the "Indemnitee") for expenses of the Indemnitee including, but not limited to, reasonable attorneys' fees, expenses and administrative hearing and court costs, in both the trial and any and all appellate proceedings, incurred either directly or indirectly, (i) in successfully enforcing any obligation of the Indemnitor under this Lease, and (ii) in defending or otherwise participating in any legal proceedings initiated by or on behalf of the Indemnitor where the Indemnitee is not adjudicated to be in default under this Lease.

Section 11.12 <u>Security Deposit.</u> To secure the prompt and faithful performance by Tenant of each and every term, covenant and condition to be performed or observed by Tenant hereunder including, without limitation, such terms, covenants and conditions in this Lease which become applicable upon the termination of this Lease or Tenant's right to possession of the Premises, Tenant has deposited the sum set forth in Subsection 1.1.19 with Landlord or Landlord's Agent as a security deposit (the "Security Deposit"). The Security Deposit shall be subject to the following terms and conditions:

(a)     From time to time, all or a portion of the Security Deposit may be applied to the curing of any Event of Default that may then exist, without prejudice to any other remedy which the Landlord may have on account thereof, and upon such application, Tenant shall pay Landlord on demand the amount so applied which shall be added to the Security Deposit so the same may be restored to its original amount;

(b)     Neither Landlord's Agent, or its partners, if any, nor Landlord in its individual capacity, shall have any responsibilities with respect to the Security Deposit and Tenant shall look exclusively to Landlord as trustee, or its successors hereof, for return of the Security Deposit upon the expiration of this Lease;

(c)     Landlord or its successors shall not be obligated to hold the Security Deposit in a separate fund, and may commingle the same with its other funds; and

(d)     If Tenant faithfully performs and observes all of Tenant's obligations, covenants, conditions and agreements hereunder, the Security Deposit, or the portion thereof not previously applied, shall be returned by Landlord to Tenant without interest no later than thirty (30) days after the later of (i) the expiration of the Term, or any renewal or extension thereof, or (ii) the final adjustment of Tenant's Pro Rata Share of Operating Costs, Real Estate Taxes and all other charges which Tenant is obligated to pay pursuant to the terms of this Lease, provided Tenant has vacated the Premises and surrendered possession thereof to the Landlord at the expiration of the Term or any extension or renewal thereof as provided herein and no Potential Event of Default is then continuing.

Page 17 of 32



LGI0000564

The Security Deposit may not be used as rent, except at the option of Landlord, as stated in this Section.

## ARTICLE XII. MISCELLANEOUS PROVISIONS

Section 12.1    Mutual Waiver of Claims and Subrogation.    Whenever (a) any loss, cost, damage or expense resulting from fire, explosion or any other casualty or occurrence is incurred by either of the parties to this Lease or anyone claiming by, through or under them in connection with the Premises, and (b) such party is then either covered in whole or in part by insurance with respect to such loss, cost, damage or expense, or required under this Lease to be so insured, then the party so insured (or so required) hereby releases the other party from any liability the other party may have on account of such loss, cost, damage or expense to the extent of any amount recovered by reason of such insurance (or which could have been recovered had insurance been carried as so required) and waives any right of subrogation which might otherwise exist in or accrue to any person on account thereof, provided that such release of liability and waiver of the right of subrogation shall not be operative in any case where the effect is to invalidate such insurance coverage or increase the cost thereof (provided that in the case of increased cost, the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost, thereupon keeping such release and waiver in full force and effect). If the party released from liability hereunder is the Landlord, the term "Landlord", for the purpose of this Section only, shall include the trustee, shareholders, partners, officers, directors and employees.

Section 12.2    Notices.  Any notice or demand from Landlord to Tenant or from Tenant to Landlord shall be in writing and shall be mailed by registered or certified mail, sent by a nationally recognized air courier (including, but not limited to, Federal Express or Purolator Courier) or licensed messenger, addressed, if to Tenant, to the Premises (except prior to the Commencement Date, to the Address of Tenant) or such other address as Tenant shall have last designated by notice in writing to Landlord, and, if to Landlord, to the place then established for the payment of rent, or such other address as Landlord shall have last designated by notice in writing to Tenant.  The customary receipt shall be conclusive evidence of such service. Notices shall be effective on the date of mailing.  Tenant may not rely on any notice, consent or approval on behalf of Landlord, given by Landlord's Agent, unless otherwise notified in writing by Landlord.

Section 12.3    Brokerage.  Tenant warrants that it has had no dealings with any broker or agent in connection with this Lease, other than the Landlord's Agent and the Leasing Broker(s), except as noted in Section 1.1.18 hereof, and covenants to pay, hold harmless and indemnify Landlord from and against any and all cost (including reasonable attorneys' fees), expense or liability for any compensation, commissions and charges claimed by any other broker or other agent with respect to this Lease or the negotiation thereof.

Section 12.4    Relationship of the Parties.  Nothing contained herein shall be deemed or construed by the parties hereto nor by any third party, as creating the relationship of principal and agent, of partnership, of joint venture, or any other relationship between the parties hereto, other than the relationship of Landlord and Tenant.

Section 12.5    Subordination.  If any mortgagee or trustee (a "Mortgagee") named in any mortgage, trust deed or any other lien resulting from any financing or refinancing currently or hereafter placed upon the Development or any part thereof, or upon any portion or all of the Development and other property (a "Mortgage") shall elect, by written notice to Tenant, to subject and subordinate the rights and interests of Tenant under this Lease (in whole or in part) to the lien of its Mortgage, the rights and interests of Tenant under this Lease shall be subject and subordinate to such Mortgage, provided that the Mortgagee shall agree in such notice to recognize the rights of Tenant hereunder in the event of foreclosure and not to disturb Tenant's continued possession of the Premises during the Term (as extended, if applicable), so long as Tenant is not in default hereunder.  The election of such Mortgagee shall be binding upon Tenant whether this Lease is dated prior to or subsequent to the date of such Mortgage.  Tenant shall execute and deliver whatever instruments may be required for such purposes and, in the event Tenant fails to do so within ten (10) days after demand in writing, Tenant does hereby appoint Landlord to do so.

Section 12.6    Attornment.  Upon written request of any Mortgagee, Tenant will agree in writing that: (i) no action to foreclose a Mortgage shall terminate this Lease or invalidate or constitute a breach of any of the terms or conditions

hereof, (ii) Tenant will attorn to the purchaser at any foreclosure sale or the grantee in any conveyance in lieu of foreclosure as landlord of the Premises, and (iii) Tenant will, upon written request of such purchaser or grantee, execute such instruments as may be necessary or appropriate to evidence such attornment; provided that the Mortgagee agrees with Tenant in writing, that so long as Tenant is not in default hereunder, Tenant's right to possession and enjoyment of the Premises shall be and remain undisturbed and unaffected by the Mortgagee or by any foreclosure proceedings under its mortgage. Tenant waives the provisions of any statute or rule of law, now or hereafter in effect, that may give or purport to give Tenant any right to terminate or otherwise adversely affect this Lease and the obligations of Tenant hereunder in the event of the prosecution or completion of any such foreclosure proceeding. Neither the Mortgagee nor any purchaser at a foreclosure sale or any grantee in a deed in lieu of foreclosure shall be liable for any amounts paid by Tenant to Landlord prior to the time such amounts become due hereunder, or any act or omission of Landlord which occurred prior to such sale or conveyance, nor shall Tenant be entitled to any offset against or deduction from rent due hereunder after such date by reason of any such prepayment by Tenant or any such act or omission of Landlord prior to such date.

Section 12.7   Estoppel Certificates. At any time, and from time to time, Tenant agrees, upon request in writing from Landlord, to execute, acknowledge and deliver to Landlord a statement in writing in form reasonably satisfactory to Landlord, certifying to Landlord, any Mortgagee or any potential purchaser of the Development, that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which the Monthly Base Rent and any and all other charges have been paid, the absence of any default or any claim or offset by Tenant against Landlord (or specifying any such default, claim or offset) and making such other accurate certifications as Landlord, such Mortgagee or such potential purchaser may reasonably require. If Tenant fails to deliver such statement within ten (10) days after request therefor, Tenant does hereby appoint Landlord in its name, place and stead to do so.

Section 12.8   Applicable Law and Construction. The laws of the state in which the Premises are located shall govern the validity, performance and enforcement of this Lease. The invalidity or unenforceability of any provision of this Lease (other than those provisions relating to the payment of rent or other charges) shall not affect or impair the validity or enforceability of any other provision of this Lease. Unless otherwise provided in this Lease, the following rules of construction and interpretation apply to this Lease: (a) headings and captions are for convenient reference only and in no way define or limit the terms of this Lease; (b) use of the word "including" shall not be interpreted to exclude anything else when following any general statement and shall not be construed to limit such statement to the specific items identified immediately after the word "including" to similar items regardless of whether non-limiting language (e.g., "without limitation", "but not limited to") appear, rather use of the word "including" shall be deemed to refer to all other things that could reasonably fall within the broadest possible scope of the applicable general statement; (c) use of the words "will" and "shall" denote a mandatory duty, have the same meaning and are interchangeable unless the context requires otherwise; (d) use of the word "may" denotes a discretionary right, not an obligation or duty; (e) the singular of any word is interchangeable with the plural and vice-versa; (f) the neuter, masculine and feminine of any word are interchangeable with each other; (g) whenever a singular term is used in this Lease, the same shall include the plural; and (h) this Lease's preamble and recitals above along with each schedule attached to this Lease, if any, is an integral part of, and incorporated within, this Lease.

Section 12.9   Time of the Essence. Time is of the essence in this Lease.

Section 12.10   Execution of Lease by Landlord. The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises and this document becomes effective and binding only upon the execution and delivery hereof by Landlord and by Tenant. All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement in writing between Landlord and Tenant, and no act or omission of any employee or other agent of Landlord, Landlord's Agent or Leasing Brokers shall alter, change or modify any of the provisions hereof. This Lease constitutes the entire agreement between Landlord and Tenant and there are no representations, warranties, promises, agreements, conditions or undertakings, oral or written, between Landlord and Tenant other than those set forth herein. Any subsequent change, addition or alteration to this Lease shall not be binding upon Landlord or Tenant unless in writing and signed by both parties.

LGI0000566

Section 12.11    Binding Effect of Lease. The terms, covenants, agreements, obligations and conditions contained herein, except as otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns subject to the rights of Landlord under Subsection 9.2.3 above. Landlord, at any time and from time to time, may make an assignment of its interest in this Lease and, in the event of such assignment and the assumption by the assignee of the terms, covenants and conditions to be performed by Landlord herein arising on or after the date of such assignment, Landlord and its successors and assigns (other than the assignee of this Lease) shall be released from any and all liability hereunder with respect to terms, covenants, agreements, obligations and conditions to be performed by Landlord.

Section 12.12    Agency or Independent Contractor. Any service which Landlord is required or elects to furnish under this Lease may be furnished by any agent employed by Landlord or by an independent contractor, and the cost thereof shall be included in any cost otherwise chargeable to Tenant for such services if the services were not completed by the Tenant as agreed

Section 12.13    Cancellation. If any Mortgagee shall require a change or changes in this Lease as a condition to its financing and if Tenant refuses to agree thereto within ten (10) days after Landlord's request for such modification (other than to changes which materially adversely affect Tenant), Landlord may terminate this Lease at any time prior to the time the Premises are made available to Tenant for Tenant's Work and, in such event, neither party shall have any further liability hereunder, except that Landlord shall return to Tenant all sums previously paid by Tenant hereunder. Such change or changes shall not adversely affect any of the provisions of this Lease relating to the amount of Annual Base Rent, restricting the purposes for which the Premises may be used, the size and/or location of the Premises, the Term and/or Commencement Date, or Landlord's Work prior to delivery of possession of the Premises to Tenant.

Section 12.14    Financial Statements. Tenant hereby represents and warrants to Landlord that the financial statements given by Tenant to Landlord prior to the execution of this Lease are true, correct and complete, and accurately state the financial condition of the Tenant and of any and all guarantors of Tenant's obligations under this Lease without material omission. Within sixty (60) days after the end of each of Tenant's fiscal years falling within the Term, Tenant shall deliver to Landlord a copy of its annual financial statements prepared in accordance with generally accepted accounting principles.

Section 12.15    Landlord's Lien. Tenant hereby grants to Landlord a lien upon all of Tenant's property now or hereafter located upon the Premises for all rent and other charges due and Tenant's performance of all obligations under this Lease. Tenant agrees, at Landlord's request, to execute a satisfactory security agreement financing statement and, if Tenant fails to immediately execute such financing statement, Tenant does hereby appoint and grant Landlord or Landlord's Agent its irrevocable power of attorney for the purpose of executing such instrument.

Section 12.16    Riders and Exhibits. Any and all Riders, if any, and all Exhibits referred to in or attached hereto are hereby incorporated into and made a part of this Lease.

Section 12.17    Force Majeure. Neither Landlord nor Tenant shall be deemed to be in default with respect to any obligation to perform any of the terms, covenants and conditions of this Lease (other than Tenant's obligation to pay Landlord any and all rent and other charges from and after the Commencement Date when the same are due), if the failure to perform any such obligation is due, in whole or in part, to any strike, lockout, labor dispute (whether legal or illegal and whether such dispute is with Landlord, Tenant or some other person or entity), labor shortage, civil disorder, failure of power, governmental laws and regulations, riots, insurrections, war, freight embargo, contractor or supplier delays, fuel, water, material or supply shortages or the inability to obtain such commodities on reasonable terms, delays in transportation, accidents, casualties, severe weather, acts of God, acts caused directly or indirectly by the other party (or such other party's agents, employees, guests or invitees), acts of other tenants or occupants of the Development or any other cause beyond the reasonable control of the party which is obligated to perform. In such event, the time for performance by such party shall be extended by an amount of time equal to the period of the delay so caused.

Section 12.18    <u>Recording</u>. This Lease shall not be recorded by Tenant. If Tenant records this Lease, then such action shall be deemed an Event of Default. Upon the execution of this Lease, Landlord and Tenant shall, at Landlord's option, execute a short form of lease provided by Landlord provided that the failure to record such short form of lease shall not affect or impair the validity and effectiveness of this Lease. Tenant hereby makes, constitutes and irrevocably appoints Landlord as its attorney-in-fact coupled with an interest to terminate any such short form of lease, if any, which has been recorded upon the expiration or termination of this Lease due to the lapse of time or otherwise.

Section 12.19    <u>Limitation of Liability</u>. Notwithstanding anything to the contrary contained in this Lease, it is specifically understood and agreed that the liability of Landlord hereunder shall be limited to the interest of Landlord in the Development in the event of a breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord. If Landlord or any successors in interest shall be an individual, joint venture, tenancy in common, firm or partnership (general or limited), there shall be no personal liability on such individual or on such joint venture, tenancy in common, firm or partnership or on any member of such joint venture, tenancy in common, firm or partnership (including any partner thereof), and Tenant hereby agrees that any judgment it may obtain against Landlord shall be enforceable solely against Landlord's ownership interest in the Development and that no property or assets of Landlord, other than the interest of Landlord in the Development, shall be subject to levy, execution or other procedure, for satisfaction of Tenant's remedies.

Section 12.20    <u>Personal Property Taxes</u>. Tenant shall pay, before delinquency, any personal property taxes attributable to the furniture, fixtures, merchandise, equipment or other personal property situated in or on the Premises. If any such personal property taxes are levied against Landlord or Landlord's property and, if Landlord pays the same (which Landlord shall have the right, but not the obligation, to do), or if the assessed value of Landlord's property is increased by the inclusion of a value placed on Tenant's property and, if Landlord pays the taxes based on such increased assessment (which Landlord shall have the right, but not the obligation, to do), Tenant, upon demand, shall repay to Landlord the taxes levied against Landlord or the proportion of such taxes resulting from any increase in the assessment on Landlord's property.

Section 12.21    <u>Easements</u>. Landlord shall have the right to grant any easements on, over, under and above the Premises for such purposes as Landlord determines, provided that such easements will not materially interfere with Tenant's use.

Section 12.22    <u>Subdivision of Development.</u> Subject to the provisions of this Lease, Landlord reserves the right to subdivide the Development. Provided Tenant's rights hereunder are not materially and adversely affected, Tenant consents (and Tenant agrees to cause any mortgagee of Tenant to consent) to any such subdivision and Tenant and its mortgagee will execute such subdivision documents as reasonably requested by Landlord.

Section 12.23    <u>Tenant's Authority</u>. If Tenant is a corporation, limited liability company, or partnership, Tenant represents and warrants that it has full corporate, company or partnership power and authority, as the case may be, to enter into this Lease and has taken all corporate, company or partnership action, as the case may be, necessary to carry out the transaction contemplated herein, so that when executed, this Lease constitutes a valid and binding obligation enforceable in accordance with its terms. Tenant hereby covenants, warrants and represents that by executing this Lease and by the operation of the Premises under this Lease, it is not violating, has not violated and will not be violating any restrictive covenant or agreement contained in any other lease or contract affecting the Tenant or any affiliate, associate or any other person or entity with whom or with which Tenant is related or connected financially or otherwise. Tenant hereby covenants and agrees to indemnify and hold harmless Landlord, any future owner of the Development or any part thereof, and any Mortgagee against and from all liabilities, obligations, damages, penalties, claims, costs and expenses, including reasonable attorneys' fees, incurred by them or any of them as a result of any breach of the foregoing covenant, warranty and representation. Tenant's liability under this Section extends to the acts and omissions of any sublessee of Tenant, and any agent, employee or licensee of any sublessee of Tenant.

Section 12.24    <u>Retail Radius Restriction</u>. Tenant and Guarantor, or any person, firm or corporation, directly or indirectly controlling, controlled by or under common control with Tenant or Guarantor, shall not directly or indirectly engage in, own or operate any business similar to that authorized to be conducted under the Lease, or use or



LGI0000568

permit the use of the same or a similar trade name, within a radius of ten (10) miles of the nearest outside boundary of the Property during the Term of the Lease, and any Option Periods; provided, however, that nothing herein shall be construed to prevent operation of any of Tenant's existing stores, as of the date of this Lease under their present trade names. In the event of any violation of the covenant contained in the previous sentence, and in addition to all other remedies for default provided under the Lease, the (a) Gross Sales of any such business within the restricted radius shall be included in the Gross Sales made from the Premises, and the Percentage Rent hereunder shall be computed upon the aggregate of the Gross Sales made from the Premises and from such other business location(s), and (b) Landlord shall be entitled to recover from Tenant and Tenant agrees to pay to Landlord, immediately on demand a penalty in the amount of the sum of (i) the total amount of Gross Rent for the previous twelve (12) calendar month period, plus (ii) the total amount of Percentage Rent for the previous twelve (12) calendar month period (such total sum referred to as the "Radius Restriction Penalty").

**LANDLORD**

LGI0000569

BY: _____

NAME: Ken Siwieck

TITLE: Agent for Long Grove Investments, LLC

Date: 8-28-17


TENANT

BY: _____

NAME: Steve Sintetus

TITLE: Owner

Date: 8-28-17

LGI0000570

## GUARANTY

IN consideration of, and as an inducement for the granting, execution and delivery of the foregoing lease dated January 28, 2017, by and between Long Grove Investments, LLC , (hereinafter "Landlord"), and Steve Sintetas _____ , (hereinafter "Tenant"), and in further consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by Landlord to the undersigned, the undersigned, (hereinafter "Guarantor"), hereby guarantees to Landlord, its successors and assigns, the full and prompt payment of rent, including, but not limited to, the fixed minimum rent, common area charges, percentage rent, additional rent, real estate taxes and any and all other sums and charges payable to Tenant, its successors and assigns under said Lease and full performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by Tenant, its successors and assigns; and the Guarantor hereby covenants and agrees to and with Landlord, its successors and assigns, that if default shall at any time be made by Tenant, its successors and assigns, in the payment of any such rent, payable by Tenant under said Lease, or in the performance of any of other terms, covenants, provisions or conditions contained in said Lease, the Guarantor will forthwith pay such rent to the Landlord, its successors and assigns, and any arrears thereof, and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions and provisions, and will forthwith pay to Landlord all damages that may arise in consequence of any default by Tenant, its successors and assigns under said Lease, including, without limitation, all reasonable attorneys' fees incurred by Landlord or caused by any such default and/or by the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional guaranty of payment and of performance. It shall be enforceable against Guarantor, its successors and assigns, without the necessity for any suit or proceedings on Landlord's part of any kind or nature whatsoever against Tenant, its successors and assigns, and without the necessity of any notice of non-payment, non-performance or non-observance or any notice of acceptance of this Guaranty or any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives; and Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, or Tenant's successors and assigns, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the said Lease.

The Guaranty shall be a continuing Guaranty, and the liability of Guarantor hereunder shall in no way be affected, modified or diminished by reason of any assignment, renewal, modification or extension of the Lease or by reason of any modification or waiver of or change in any of the terms, covenants, conditions or provisions of said Lease, or by reason of any extension of time that may be granted by Landlord to Tenant, its successors or assigns, or by reason of any dealings or transactions or matter or thing occurring between Landlord and Tenant, its successors or assigns, whether or not notice thereof is given to Guarantor.

GUARANTOR: Steve Sintetus

Dated:

LGI0000571

LGI0000572

**LANDLORD**

STATE OF ILLINOIS )
                 )
COUNTY OF _____ )

I, _____ a Notary Public in and for said County in the State aforesaid, DO HEREBY CERTIFY that __Ken Siwieck__ personally known to me to be the same person whose name is subscribed to the foregoing instrument as ___Agent___ of __Long Grove Investments, LLC__ appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act, and as the free and voluntary act of said entity, for the uses and purposes therein set forth;

GIVEN under my hand and Notarial Seal this _____ day of _____, 2017.

_____
Notary Public

**TENANT**

STATE OF ILLINOIS )
                 ) SS
COUNTY OF _____ )

I, _____, a Notary Public in and for said County in the State aforesaid, DO HEREBY CERTIFY that __Steve Sintetas__ _____, personally known to me to be the same person(s) whose name(s) is/are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/they signed, sealed and delivered the said instrument as his/their free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this _____ day of _____, 2017.

_____
Notary Public

**GUARANTOR**

STATE OF _____ )
                   ) SS
COUNTY OF _____ )

I, _____, a Notary Public in and for said County in the State aforesaid, DO HEREBY CERTIFY that __Steve Sintetas__ _____, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his/their free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this _____ day of _____, 2017.

_____
Notary Public

LGI0000573

**EXHIBIT B:    PLAN OF THE PREMISES**

LGI0000574

**EXHIBIT C:**

LGI0000575

**EXHIBIT E:    SIGN CRITERIA**

These criteria for new signs are intended to provide a means of controlling tenant signage on Fountain Square retail buildings, by setting standards for sign type, letter type, colors, locations and the understanding of a merchant's need for exposure.

Upon acceptance, these criteria shall apply to all tenant signs at Fountain Square. Signs for the retail buildings are intended to provide an overall uniform appearance while allowing a controlled range of flexibility for tenants' individual interests and needs. All new signs shall be erected in conformance with the following requirements:

SIGN TYPE:    As approved by Landlord

SIGN COLOR:    Upon Landlord's approval, signs shall be allowed in colors as approved by Landlord and governing authorities.

In the case of a national or regional retailer, tenant signs, logos and colors will be reviewed and approved by owner, subject to approval by the Village of Long Grove.

MOUNTING LOCATION:  As approved by Landlord.

Signs shall be located in the designated areas according to building elevations and subject to advance Landlord approval. In the case of canopies and awnings, the centerline of the sign shall correspond to the centerline of the canopy of which the sign is located.

MOUNTING CONSTRUCTION:    All signs shall be erected in the vertical plane on all canopies.

All lettering shall be connected to the raceway individually with no exposed letter supports allowed.

NUMBER & TYPE OF SIGNS:    As approved by Landlord.

GENERAL:    While it is the intent of these criteria to establish controlling requirements for tenant signage at Fountain Square it is in no way intended to relieve the tenant from conforming with any and all additional applicable requirements of the sign ordinance of the Village of Long Grove.

PYLON SIGNAGE:    If Landlord elects to install a monument and/or pylon sign(s) for the Building, Tenant may, at its sole cost and expense, place its sign panel on the pylon sign if the sign accommodates individual tenant signage. Tenant shall be responsible for the fabrication and the installation of said sign panel the design of which shall be subject to approval of Landlord and shall be in compliance with any governmental sign ordinances or governmental codes and subject to approval of the Village of Long Grove. Tenant shall install said sign panel within the later to occur of (i) three (3) months of the Delivery Date, or (ii) within three (3) months of the completion of the pylon/monument sign structure (subject to Force Majeure as defined in Section 12.17) or Tenant's right to use said pylon sign panel shall terminate. The cost of operating, maintaining repairing the pylon signs shall be included in Operating Costs.

LGI0000576

**EXHIBIT F:   STATEMENT AS TO COMMENCEMENT DATE AND TERMINATION DATE**

It is hereby agreed among the parties to a certain lease dated ___January___ , 2016 ___ , for spaces __230 Robert Parker__ , in ___Fountain Square___ Shopping Center (the "Lease"), between __Bell's Apple Orchard and Bakery, LLC__ ("Tenant"), and __Long Grove Investments, LLC__ ("Landlord") that:

1.  The Commencement Date of the Lease referred to in 1.1.11 and Section 2.9: is _____

2.  The Termination Date of the Lease referred to in Subsection 1.1.20, Section 2.8 and Section 2.9 is _____

3.  The first Operating Year shall commence on the first day of _____


Agreed to by Landlord:                           Agreed to by Tenant:

_____                    _____


By: __Ken Siwieck__                              By: __Steve Sintetas__

    Its: __Agent__                                     Its: __Owner__

LGI0000577

## EXHIBIT G:    PROHIBITED USES

**Prohibited Uses:**

"Prohibited Uses" will mean:

1.  Sales, storage or leasing of automobiles, boats or other vehicles;
2.  Adult book store, adult theatre, adult amusement facility, or any facility selling or displaying pornographic materials or having such displays;
3.  Odd lot, closeout or liquidation store;
4.  Auction house;
5.  Flea market;
6.  Any facility selling or displaying illegal drug paraphernalia;
7.  Any use which creates a nuisance; or
8.  A drug store or a so-called prescription pharmacy or for any other purpose requiring a qualified pharmacist or other person authorized by law to dispense medicinal drugs, directly or indirectly, for a fee or remuneration of any kind.

LGI0000578

THIS PAGE LEFT INTENTIONALLY BLANK

LGI0000579